UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTORIA CHAVEZ,<br><br>           Plaintiff,<br><br>      v.<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF THE<br>SOCIAL SECURITY ADMINISTRATION,<br><br>           Defendant. | Case No. ED CV 12-1771-PJW<br><br>MEMORANDUM OPINION AND ORDER |

## I. INTRODUCTION

Plaintiff appeals a decision of Defendant Social Security Administration ("the Agency"), denying her application for Disability Insurance benefits ("DIB") and Supplemental Security Income ("SSI"). She claims that the Administrative Law Judge ("ALJ") erred when he rejected her testimony and when he discounted the opinions of her treating and other doctors. For the reasons explained below, the Court concludes that the ALJ erred and remands the case to the Agency for further consideration.

## II. SUMMARY OF PROCEEDINGS

In 2007, Plaintiff applied for SSI, alleging that she had been unable to work since December 1999 due to problems with her neck,

back, and muscles, and hand pain. (Administrative Record ("AR") 122-29, 224, 246, 254-57.) She also applied for DIB. (AR 149-50.) The Agency denied the applications initially and on reconsideration. (AR 98-103, 107-11.) Plaintiff then requested and was granted a hearing before an ALJ. (AR 113-16.) On June 15, 2011, Plaintiff appeared with counsel and testified at the hearing. (AR 69-88.) The ALJ subsequently issued a decision denying benefits. (AR 18-35.) Plaintiff appealed to the Appeals Council, which denied review. (AR 1-6, 15-17.) She then commenced this action.

## III. ANALYSIS

### A. The ALJ's Treatment of the Medical Evidence

Plaintiff's primary complaint is that she suffers from fibromyalgia, which causes her constant, unrelenting pain. Some of the doctors, including her treating doctors, agreed with her; others, the non-treating doctors, did not. The ALJ sided with the non-treating doctors. Plaintiff claims that the ALJ erred in doing so. For the following reasons, the Court concludes that remand is warranted on this issue.

#### i. A Review of the Medical Evidence

In November 1999, Plaintiff was injured when a patient at the hospital where she was working grabbed her hair and pulled her head back. (AR 74, 571.) In January 2000, her chiropractor, Dr. Victor Fantasia, found her temporarily disabled. (AR 565.) In March 2000, orthopedist Dr. Ram Mudiyam noted that her cervical spine was tender and had a reduced range of motion, but x-rays of her spine were unremarkable. (AR 553-55.) In August 2000, rheumatologist Dr. Allen Salick found that Plaintiff exhibited 12 of the tender points associated with fibromyalgia and noted that she complained of sleep

problems and fatigue. (AR 533-37.) Dr. Salick diagnosed her with Atypical or Early Fibromyalgia. (AR 537.) In January 2002, Dr. Salick reexamined her and, after finding that she had all of the tender points, diagnosed her with classic fibromyalgia syndrome. (AR 498, 500.)

In July 2002, qualified medical examiner Dr. Rodney Bluestone, another rheumatologist, examined her in connection with her worker's compensation case and diagnosed her with an acute cervical and lumbar sprain and "the rapid development of posttraumatic fibromyalgia." (AR 480.) In February 2003, rheumatologist Dr. Stuart Silverman also diagnosed Plaintiff with fibromyalgia. (AR 935.)

In November 2003, Plaintiff was examined by an orthopedist, qualified medical examiner Dr. David Doty, who noted her complaints of widespread pain as well as tenderness and reduced range of motion in her cervical and lumbar spines. (AR 372-73, 381-83.) Dr. Doty opined that Plaintiff was precluded from heavy lifting but deferred to a rheumatologist on whether she suffered from fibromyalgia. (AR 382, 383.)

In May 2004, Dr. Blake Thompson, a physical medicine and rehabilitation specialist, conducted an agreed medical examination of Plaintiff. (AR 341-61.) Dr. Thompson rejected a diagnosis of fibromyalgia, finding that Plaintiff was tender "even in places that should not be tender" and diagnosed her with symptom magnification syndrome. (AR 354, 356.)

In July 2004, Dr. Bluestone wrote a supplemental report, taking issue with Dr. Thompson's conclusion and pointing out that tenderness throughout the body was not incompatible with a fibromyalgia diagnosis. (AR 332-33.)

In May 2006, Dr. Thompson examined Plaintiff again. (AR 788-804.) Without addressing Dr. Bluestone's supplemental report, Dr. Thompson concluded once again that Plaintiff's primary diagnosis was symptom magnification syndrome. (AR 800.)

In December 2005, consultative orthopedist Dr. Bunsri Sophon examined Plaintiff. (AR 757-61.) Dr. Sophon diagnosed her with cervical and lumbar sprain and opined that she would be able to perform at least medium-level work. (AR 761.) On reexamination in September 2010, Dr. Sophon reached the same conclusion regarding Plaintiff's functional limitations. (AR 1170.) Dr. Sophon made no mention of fibromyalgia.

In June 2007, another consultative orthopedist, Dr. Kambiz Hannani, examined Plaintiff and concluded that she would be able to perform medium-level work. (AR 1116.) Dr. Hannani made no mention of fibromyalgia, either.

In April 2009, orthopedist Dr. Stephen Weiss examined Plaintiff. (AR 1200-15.) He concluded that she could work full time from an orthopedic standpoint, but recommended that she be seen by an agreed examiner in rheumatology with respect to her fibromyalgia complaints. (AR 1194, 1195.) In September 2009, rheumatologist Dr. Seymour Levine examined Plaintiff. (AR 1218-58.) He concluded that she had developed fibromyalgia secondary to her workplace injury and opined that she would be capable of no more than part-time, semi-sedentary work for up to four hours a day. (AR 1244, 1252.)

    ii.  <u>The ALJ's Analysis</u>

The ALJ afforded "little weight" to the opinions of rheumatologists Salick, Bluestone, Silverman, and Levine, all of whom concluded that Plaintiff suffered from fibromyalgia. (AR 29.)

1  Instead, he adopted the opinion of Dr. Thompson, a pain management
2  specialist, who concluded that Plaintiff suffered from symptom
3  magnification syndrome.  (AR 29-30.)  The ALJ found that Dr.
4  Thompson's diagnosis was supported by Dr. Bluestone's observation that
5  Plaintiff had an exaggerated pain response, by Dr. Hannani's statement
6  that Plaintiff was hypersensitive upon examination, and by Dr. Weiss's
7  report that Plaintiff exhibited symptom magnification.  (AR 30.)  The
8  Court concludes that the ALJ erred in doing so.
9       ALJs are tasked with resolving conflicts in the medical evidence.
10 *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  In doing so
11 they may accord greater weight to a treating physician--who was hired
12 to cure the claimant and has more opportunity to know and observe
13 her--than an examining physician, who sees the claimant only once for
14 the sole purpose of rendering an opinion in the context of legal
15 proceedings.  *Id.* at 1041-42; *see also* 20 C.F.R. § 404.1527(c)(2)
16 ("Generally, we give more weight to opinions from your treating
17 sources, since these sources are likely to be the medical
18 professionals most able to provide a detailed, longitudinal picture of
19 your medical impairment(s) and may bring a unique perspective to the
20 medical evidence that cannot be obtained from the objective medical
21 findings alone or from reports of individual examinations").
22 Furthermore, specialists are entitled to deference over non-
23 specialists.  *See Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir.
24 1996); 20 C.F.R. § 404.1527(c)(5).
25      All four rheumatologists who examined Plaintiff diagnosed her
26 with fibromyalgia and documented clinical findings to support their
27 diagnosis, i.e., tender points.  (AR 367, 480, 536-37, 931, 935, 975-
28 76, 1227.)  Generally speaking, their opinions are entitled to greater

weight than those of the other doctors, such as Dr. Thompson, because rheumatology is the relevant specialty for fibromyalgia. *Benecke v. Barnhart*, 379 F.3d 587, 594 n.4 (9th Cir. 2004). The ALJ chose to rely on non-specialist, Dr. Thompson. That reliance, in and of itself, is not cause for overturning the decision but, as explained below, the Court finds here that further analysis is warranted.

Dr. Thompson's reasons for rejecting the fibromyalgia diagnosis are not supported by the record. He based his opinion in large part on his finding that Plaintiff's complaints--for example, that she needed to use a wheelchair and had made numerous visits to the emergency room--were extreme in light of the objective findings. (AR 343, 355-57.) But, as the Ninth Circuit has explained, fibromyalgia is a disease that eludes objective measurement. *Benecke*, 379 F.3d at 594. Dr. Thompson's conclusion that the objective findings did not support such extreme impairment runs counter to *Benecke*.

Dr. Thompson also focused on the fact that Plaintiff complained of tenderness in areas that, in Dr. Thompson's view, are not normally associated with fibromyalgia. (AR 354.) As rheumatologist Bluestone noted, however, tenderness throughout the body is consistent with a finding of fibromyalgia. (AR 333.) Yet, Dr. Thompson never addressed Dr. Bluestone's position and the ALJ never explained how he resolved the apparent contradiction between Dr. Thompson's opinion that tenderness should be limited to certain places and Dr. Bluestone's opinion that it need not be.

The ALJ also found that Dr. Thompson's diagnosis of symptom magnification was supported by the observations of Dr. Bluestone, Dr. Hannani, and Dr. Weiss. It appears, however, that those observations could be explained by Dr. Bluestone's finding that fibromyalgia

sufferers often experience generalized tenderness and hyper-sensitivity, which, again, the ALJ never addressed.  Furthermore, Dr. Weiss expressly deferred the fibromyalgia diagnosis to a rheumatologist.  (AR 1194.)  That rheumatologist, Dr. Levine, thereafter diagnosed Plaintiff with fibromyalgia.  (AR 1244.)

Finally, the ALJ noted that Dr. Thompson observed that Plaintiff was able to lift her two-year-old in the waiting room but professed being only able to lift "very light weights."  (AR 30, 356, 799.)  He also noted that she moved with alacrity and ease outside his office but moved slowly and deliberately inside.  (AR 30, 356, 799.)  The Court cannot determine at this stage that Plaintiff's lifting of her two-year-old contradicts her claim that she can only lift very light weights.  As to the speed and ease she moved outside the doctor's waiting room, clearly, that is a cause for concern and suggests that she is exaggerating her symptoms, but the Court is hard pressed to conclude that this reason alone is enough to reject the rheumatologists' opinions that Plaintiff suffered from fibromyalgia and accept the consulting doctor's opinion that she was faking.  On remand, the ALJ should resolve the issue of whether widespread tender points is or is not consistent with a diagnosis of fibromyalgia.  To do so, he may find it necessary to rely on the testimony of a medical expert, presumably a rheumatologist, to explain the contradictory evidence in this record.[1]

---

[1] The Court notes that the ALJ determined at step two that Plaintiff's fibromyalgia was not a severe impairment.  (AR 24.) Where, as here, the rheumatologists have all agreed that she suffers from fibromyalgia and that it causes some limitations, it appears that that was error per se.  *See, e.g., Contreras v. Astrue*, 378 Fed. Appx.
continue...

B.   The ALJ's Credibility Determination

The ALJ concluded that Plaintiff's claims of disabling symptoms were exaggerated, at best, and rejected them. (AR 27-34.) Plaintiff alleges that the ALJ erred in doing so. For the following reasons, the Court agrees and remands the issue to the Agency for further consideration.

ALJs are tasked with judging the credibility of witnesses. Where a claimant has produced objective medical evidence of an impairment which could reasonably be expected to produce the symptoms alleged and there is no evidence of malingering, the ALJ can only reject the claimant's testimony for specific, clear, and convincing reasons. *Smolen*, 80 F.3d at 1283-84.

In a May 2007 pain questionnaire, Plaintiff claimed that she suffered from pain all day throughout her whole body, which prevented her from thinking, walking, and working. (AR 254, 255.) She reported that Motrin dulled the pain but did not get rid of it. (AR 254.) She estimated that she could walk no more than a half-mile and stand or sit for no longer than a half-hour. (AR 256.) At the June 2011 administrative hearing, Plaintiff testified that she was in pain from her neck to her waist every day. (AR 74.) She also testified that she drops things with her right hand and that she has to get up and move at least every half-hour. (AR 75.)

Despite these allegations, the ALJ determined that Plaintiff could perform a full range of medium work, including lifting up to 50

---

[1] ...continue
656, 658 (9th Cir. 2010) (holding ALJ erred in finding fibromyalgia diagnosis not medically determinable at step two where the only rheumatologist to examine the claimant noted complaints of fatigue, depression, and migraines and documented multiple tender points).

pounds occasionally and 25 pounds frequently, and sitting, standing, and walking for up to six hours in an eight-hour workday. (AR 26.) The ALJ rejected her complaints allegedly arising from fibromyalgia, giving her "the benefit of great doubt" with respect only to the claim that her musculoskeletal impairment would preclude her from heavy lifting. (AR 31.) The ALJ based his credibility finding on the fact that her allegations were not supported by the objective medical evidence; her treatment for fibromyalgia had been conservative; her treatment for depression and anxiety had been almost nonexistent; and her daily activities suggested greater ability than she claimed. (AR 27-34.) The Court takes each of these in order.

As the Court has already discussed in connection with its assessment of the doctors' opinions, fibromyalgia is a disease that is not readily definable by objective signs. *Benecke*, 379 F.3d at 594. In fact, it is the diagnosis that remains after the doctors have eliminated the other known causes of widespread pain and lethargy. As the Ninth Circuit explained in *Benecke*,

> Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community. The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms. The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis.

379 F.3d at 590.

Thus, the ALJ's finding that Plaintiff's claims were exaggerated because the objective signs did not support such disabling pain and

incapacity is contrary to the Ninth Circuit's holding in *Benecke* and is rejected.

The ALJ also questioned Plaintiff's sincerity because he concluded that she had not received the type of care that someone complaining of pain as she did would receive.  Although this is, generally speaking, a legitimate reason for disbelieving a claimant's allegations, *see*, *e.g.*, *Parra v. Astrue,* 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding the severity of an impairment."), the ALJ did not specify what evidence in the record there was to suggest that Plaintiff's fibromyalgia treatment was conservative, as opposed to some other more aggressive treatment used to treat this disease, which she refused.  The ALJ pointed to Plaintiff's reluctance to follow Dr. Silverman's recommendation to undergo an intensive fibromyalgia pain management program at Cedars-Sinai Hospital in December 2002 and, later on, at Loma Linda Hospital or Casa Colina of the San Bernardino Rehabilitation Institute.  (AR 31.)  The records show, however, that Plaintiff attended at least parts of the program.  (AR 912-20.)  Further, a program report noted that she had missed sessions because of child care issues, pain, and drug side-effects.  (AR 912.)

Furthermore, the record does not support the ALJ's finding that Plaintiff did not receive appropriate treatment for her condition.  (AR 32.)  In May 2003, Plaintiff told Dr. Ronald Bishop, a pain management specialist, that physical therapy had only been "minimally beneficial" and that acupuncture and morphine injections had not helped.  (AR 744.)  On Dr. Bishop's recommendation, Plaintiff underwent a series of epidural and trigger-point injections in May and

1  June 2003.  (AR 394-95.)  These injections went well beyond what one
2  would define as conservative treatment.  *See*, *e.g.*, *Huerta v. Astrue*,
3  2009 WL 2241797, at *4 (C.D. Cal. July 22, 2009) (rejecting ALJ's
4  finding that claimant's pain management treatment, including epidural
5  steroid injections, constituted conservative treatment and citing
6  cases).  Additionally, Plaintiff continued to receive chiropractic
7  treatment throughout the period at issue and resumed physical therapy,
8  including heat and electrical stimulation, ultrasound, and myofascia
9  release, in 2008.[2]  (AR 1179, 1231.)
10      The ALJ relied on the fact that Plaintiff did not pursue
11 treatment for her anxiety and depression to conclude that she was
12 exaggerating her claims of pain stemming from fibromyalgia.  The Court
13 does not find this evidence so compelling.  Though the two may be
14 interrelated, the Court does not agree that evidence that Plaintiff
15 did not pursue psychotherapy for depression and anxiety proves that
16 she did not have fibromyalgia.  Further, the fact that someone who
17 alleges a mental impairment like depression does not seek treatment is
18 not a sound basis for criticism since poor judgment often goes hand-

---

[2] At the same time, the record supports the ALJ's finding that Plaintiff did not regularly take prescription pain medication.  In September 2009, for example, Plaintiff told Dr. Levine that she suffered from "the global pain of fibromyalgia 24 hours a day, seven days a week[,]" that the pain averaged 8 on a scale of 0 to 10 on days when she was working (and 6 out of 10 when she was not working), and that she suffered from headaches every three to four days.  (AR 1221.)  Despite this constant pain, however, Plaintiff reported taking Motrin for "bad" pain no more than once or twice a week, and Midrin for "bad" headaches, once a month.  (AR 1221.)  On remand, the ALJ should determine what weight to give this evidence in light of the other medical records.

in-hand with a mental impairment like depression.[3]  *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996).

Finally, the ALJ concluded that Plaintiff's daily activities, including giving birth to two children and raising them since contracting fibromyalgia suggests that she is more capable than she claims. (AR 32.) The Court would agree. Plaintiff presents herself to doctors and to the ALJ as someone who can hardly get through the day due to her chronic pain and suffering. That presentation seems to run counter to a woman who gets married, twice, and bears two children and raises them. Thus, the Court concludes that this is a good reason to question Plaintiff's credibility.

The Court also notes the general uncertainty caused by the several doctors who believed that Plaintiff was feigning her symptoms. This, too, causes concern regarding Plaintiff's testimony.

The issue that remains is whether the ALJ's credibility finding should be upheld, despite the errors discussed above. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (holding error by ALJ in credibility determination is harmless "[s]o long as there remains substantial evidence supporting the ALJ's conclusions on ... credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion."). On the record before the Court, it is difficult to determine. Thus, the

---

[3] The ALJ also found that Plaintiff's work activity after her alleged onset date indicated that she could do more than she claimed. (AR 32.) Plaintiff testified, however, that she returned to work in 2009 in a new, more limited role because she could no longer do her former work. (AR 78.) Moreover, Dr. Weiss noted that she was working only a 20-hour week and Dr. Levine noted that, after she was injured at work in March 2009, her job duties were further limited. (AR 1179, 1237.)

12

Court concludes that remand on the issue is the most prudent course. On remand, the ALJ should reconsider the credibility determination in light of the record as it exists as well as any other evidence introduced on remand.

## IV. CONCLUSION

For the reasons set forth above, the Agency's decision is reversed and the case is remanded for further consideration consistent with this decision.

IT IS SO ORDERED.

DATED: March 31, 2014.

*Patrick J. Walsh*

PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Social Security\CHAVEZ, 1771\memo opinion and order.wpd